# EXHIBIT "21"

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

```
PETER G. SEBALA,              )
                              )
        Plaintiff,            )
                              )
vs.                           ) CIVIL NO.03-00066
                              ) HG-KSC
DR. JAMES G. ROCHE,           )
SECRETARY, DEPARTMENT OF      )
THE AIR FORCE,                )
                              )
        Defendant.            )
                              )
```

DEPOSITION OF PETER SEBALA

Taken on September 7th, 2005, commencing at 1:20 p.m. at the office of the United States Attorney, 300 Ala Moana Boulevard, Room 6100, Honolulu, Hawaii, before Rita King, a Certified Court Reporter in the State of Hawaii.

Ralph Rosenberg Court Reporters, Inc.

Ofc: 808.524.2090   Fax: 808.524.2596

**EXHIBIT "21"**

Page 6

1  complaint is accurate.
2      Mr. Sebala, is everything in that
3  document accurate, to the best of your knowledge?
4      A.  Yes, to the best of my knowledge.
5      Q.  And on page 2 of Deposition Exhibit 1
6  you've indicated that defendant's conduct is
7  discriminatory with respect to national origin, and
8  you checked the box there, you checked: Other as
9  specified below.  What specifically are you
10 intending by other?
11     A.  Well, I don't know the boss didn't like
12 me or not.  A few months earlier we had a run-in,
13 yeah, because of my sick leave, and I was really
14 sick, and I called in early in the morning, I think
15 it was like about 6 o'clock, something like that,
16 maybe before that, and I told him I'm sick, I
17 cannot come to work, and my wife is also sick.  And
18 then he told me, Brah, you pick a wrong day for be
19 sick.  So that was the complaint.  So I went to see
20 my union representative, and they was trying to
21 settle this and that, and in between that time we
22 was getting hard time already.
23     I came in the next day, and I told him I
24 cannot stay because I'm sick, so I got to go home,
25 so he left me off then, like he had to see me

Page 7

1  first, see if I'm really sick.  I'm not that kind
2  of person, to play the sick leave role, if I'm
3  sick, I'm sick.  And I think I was out for about
4  four or five days after that, really sick, and then
5  from that time on, we no was on one, on a good
6  level already.  So I don't know if that was the
7  case or something else.
8      Q.  So, let me make sure I understand.  You
9  think one of the reasons he's discriminated against
10 you is favoritism or not liking you; is that
11 correct?
12     MS. CARPENTER-ASUI:  I'll object;
13 misstates the evidence.
14     Q.  BY MS. WIRTANEN:  Mr. Sebala, when your
15 counsel objects, without her specifically telling
16 you not to answer a question, you're still required
17 to answer the question.
18     A.  I couldn't hear.
19     Q.  Oh, I'm sorry.  Let me repeat that.
20     So you believe that one of the reasons
21 you were discriminated against was favoritism or
22 that your boss didn't like you.
23     A.  Favoritism and probably he didn't like me
24 much because of that complaint.  He's the kind of
25 person that it's my way or no way, you know, and

Page 8

1  that's how we saw it at the shop, you know.  He
2  don't like things like this happen, we make
3  complaints and stuff.
4      Q.  And by "he", you're referring to who by
5  name?
6      A.  Randall Nunes.
7      Q.  You've checked the box national origin.
8  What is your national origin?
9      A.  I guess I didn't understand that.  I
10 still don't understand it.  When I went in to make
11 a complaint to Mrs. Dove, she called out all of
12 this stuffs here, and she said that I needed to
13 check out at least one of them, so I put down
14 discrimination, job discrimination or age
15 discrimination, and then we went on from there.
16     Q.  Do you believe you were discriminated
17 against because of your national origin?
18     A.  I believe I was discriminated against my
19 job, on the job, you know, having a younger person.
20 Instead of me being on the job -- I worked in the
21 tire shop for 27 years, 27-and-a-half years on a
22 plantation, and I talked to -- after this complaint
23 came up, you know, I called the supervisor, Randall
24 Nunes, the hiring body, and I told him how come you
25 never hire me, and he said because the other guy no

Page 9

1  qualify, but I already knew who the other guy was.
2      Earlier, when I found out about this,
3  that I wasn't going to get this job, I was checking
4  on another job I had applied for there and found
5  out that I wasn't going to be hired for this job
6  before the letter of refusal to have the job, that
7  the guy was already working there, and I talked to
8  a couple of the guys over there, he already working
9  there.  I said, okay, I go wait for that paper,
10 non-acceptable letter or whatever, you know, to
11 come, and then I gonna make one complaint.  And
12 when I got the letter, I called the supervisor, I
13 called the civil personnel, and --
14     MS. CARPENTER-ASUI:  Mr. Sebala, let's
15 just wait for her questions.  Just answer her
16 question, and then she'll ask you a question, then
17 you answer, like this.
18     Q.  BY MS. WIRTANEN:  And you said the other
19 guy that was hired, what was his name?
20     A.  Chris Vargas.
21     Q.  And do you know what his national origin
22 was?
23     A.  Not really.
24     Q.  Do you know what is meant by national
25 origin?

Page 22

1  Q.  Did he discuss this form with you at all?
2  A.  Yes.
3  Q.  And what was said?
4  A.  I asked him why was the rating so in the
5  middle, and he told me you don't worry about that,
6  you just temporary anyways, temporary, and then as
7  you go along we rate you again. Because a couple
8  of the guys in there told me, well, I was kind of
9  low in the middle so you should go ask the
10 supervisor what it means, is what they told me,
11 what it means. So I went and go ask him, he said
12 if you want to talk about it, we can discuss it,
13 and then he told me I was just temporary and no
14 worry about that.
15 Q.  Were you ever given another feedback like
16 this one in your employment?
17 A.  I think this was the only one.
18 Q.  You also have some military service?
19 A.  Yes.
20 Q.  Tell us about that.
21     MS. CARPENTER-ASUI: I'm going to object.
22 That's a little broad for him.
23 Q.  BY MS. WIRTANEN: I'll clarify. When did
24 you serve in the military?
25 A.  From '70 to '71.

Page 23

1  Q.  And how many months were you in the
2  service?
3  A.  About a year-and-a-half.
4  Q.  Which service were you in?
5  A.  I was in the Army, U.S. Army.
6  Q.  And did you serve overseas?
7  A.  I served time in Vietnam, yes.
8  Q.  How much time were you in Vietnam?
9  A.  A whole tour.
10 Q.  And how long was a whole tour?
11 A.  A year.
12 Q.  Did you serve again in Vietnam?
13 A.  No, just one tour. Well, actually, 10
14 months.
15 Q.  Did you receive any type of decorations
16 or medals from your service?
17 A.  Yes. I don't remember the medals. I
18 know I got my CIV badge and a bronze star, and the
19 rest I don't know.
20 Q.  And CIV badge, can you describe what that
21 is?
22 A.  Combat infantry badge.
23 Q.  I'm in the Air Force so I don't know the
24 Army, I apologize for that.
25    (Exhibit Number 7 was marked for

Page 24

1  identification.)
2  Q.  BY MS. WIRTANEN: Next I'm having
3  deposition Exhibit 7 handed to you. You spoke a
4  little bit what happened with your sick leave so
5  why don't you tell me what exactly -- let's go into
6  more detail. You needed to take sick leave on the
7  28th of August; is that correct?
8  A.  Yes.
9  Q.  And did you call in sick or how did you
10 notify your supervision you were sick?
11 A.  I called his office.
12 Q.  And who is he?
13 A.  Randall Nunes, supervisor.
14 Q.  When did you call him?
15 A.  Roughly, around 5:45, 6 o'clock.
16 Q.  On the day you were sick?
17 A.  Yes.
18 Q.  And that would be A.M.?
19 A.  Yes.
20 Q.  What did you tell him?
21 A.  I told him that I was sick, I wasn't
22 coming in to work, and then he went off on me. He
23 just told me it's a bad day for you calling me --
24 no, he said it's a wrong day for you call in sick.
25 And I said what is the right day, I'm sick, and

Page 25

1  went off. And we was yelling at each other. I was
2  on the phone for a while, and I woke up my wife,
3  and she was sick already, and I just told my
4  supervisor I sick, what I can do, I can't do
5  anything. I was going to stay home. And he went
6  off on me again. I just said I'm sick, and I hang
7  up the phone. Then I came in the next day.
8  Q.  Let's go back. You said he went off on
9  you. What do you mean by that?
10 A.  He started yelling at me that it was the
11 wrong timing I picked for be sick.
12 Q.  So yelling, he was talking loudly?
13 A.  We was yelling at each other, yeah.
14 Yelling. Not talking loudly, yelling.
15 Q.  And you were sick. What type of sickness
16 did you have?
17 A.  I don't know, I think I had the flu or
18 something, upset stomach, runs, you know, just
19 weak.
20 Q.  And then you came in the next day and
21 what happened?
22 A.  I reported to work, we went through the
23 morning routine, and then I went to his office
24 after the meeting, and I just told him I cannot
25 take it, I got to go home, I'm too sick, and he

7 (Pages 22 to 25)

Ralph Rosenberg Court Reporters, Inc.
Ofc: 808.524.2090  Fax: 808.524.2596

**Page 26**

1  said -- he going to make me one paper, and he made
2  me the paper and I went home.
3  Q.  Did he yell at you that time or go off on
4  you or anything like that?
5  A.  No, not that morning. He saw I was
6  really sick. I didn't want to add to the problem.
7  Q.  So you went home on the 29th of August;
8  is that correct?
9  A.  Yes.
10 Q.  And then when did you return to work?
11 A.  It was the following week.
12 Q.  Did you have any further discussions with
13 your supervisor, Mr. Nunes, about your sick leave?
14 A.  I don't recall, not too sure about it.
15 Q.  Did you file a grievance or talk to
16 anybody about it?
17 A.  Yes, talked to the union representative.
18 Q.  Who was that?
19 A.  Ronald -- he changed his name. I think
20 it's Henderson or Anderson, I'm not sure.
21 Q.  And what did he tell you you should do?
22 A.  No, I told them what had happened, and he
23 said, okay, we're going to take care of this. We
24 at step one, the talk, and then he told me he was
25 going to keep in touch with me. He kept in touch

**Page 27**

1  with me, telling me that he had talked to
2  Mr. Nunes' supervisor and they all aware of this,
3  and they went on for a couple months.
4  Q.  Who is Mr. Nunes' supervisor?
5  A.  Peris, I think it was, Tim Peris.
6  Q.  How do you spell that last name?
7  A.  P-e-r-i-s, I think.
8  Q.  Can you take a moment to look at
9  deposition Exhibit 7, read through it, and I'm
10 going to ask you if everything in here is correct,
11 is true, so please read it with that in mind.
12     Mr. Sebala, have you had a chance to look
13 that over?
14 A.  Yes.
15 Q.  Is that document, Deposition Exhibit 7,
16 is that your writing?
17 A.  Yes.
18 Q.  And did you write this?
19 A.  Yes.
20 Q.  And is everything in it true, to the best
21 of your knowledge and belief?
22 A.  Yes, it is.
23 Q.  There's nothing in here you'd like to
24 change.
25 A.  Nothing.

**Page 28**

1  Q.  Mr. Sebala, when is your birthday?
2  A.  August 27th, 1949.
3  Q.  Throughout your employment for that one
4  year that you were a temporary employee, did
5  anybody talk to you about your work, like counsel
6  you that you weren't doing good work or anything
7  like that?
8  A.  That was that checklist, is what we
9  discussed with Randy, supervisor.
10 Q.  So you're talking about deposition
11 Exhibit 6?
12 A.  Yeah, that's it.
13 Q.  And I just showed him deposition
14 Exhibit 6.
15     Was there any other time that any of your
16 supervisors told you you did something wrong or
17 weren't doing a good enough job?
18 A.  No.
19 Q.  Do you know who Mr. Eassu Soares is?
20 A.  Who is that? Oh, Eassu Soares. Yes, I
21 do.
22 Q.  Has he ever spoken with you about your
23 job?
24 A.  He was one of the mechanics.
25 Q.  Did he ever talk to you about not working

**Page 29**

1  hard enough?
2  A.  Never.
3  Q.  When did you learn that there was a
4  vacancy in the tire shop for a permanent position?
5  A.  Not too sure about the month, but I think
6  it was like in January, I think, just before I was
7  leaving the Hickam Air Force.
8  Q.  So the job that was being announced, that
9  was your job that you held temporarily was being
10 changed into a permanent position; is that right?
11 A.  Yes.
12 Q.  And were you ever told why you didn't
13 automatically receive the job?
14 A.  No. You mean from Randy Nunes?
15 Q.  From anyone.
16 A.  No, I waited until that piece of paper
17 came.
18 Q.  So let's mark this as deposition Exhibit
19 8.
20     (Exhibit Number 8 was marked for
21 identification.)
22 Q.  BY MS. WIRTANEN: Do you recognize this
23 document, Mr. Sebala?
24 A.  I'm not sure about this. My son did it.
25 I had my resume made, and my son went online and