<pre>
 1                 IN THE UNITED STATES DISTRICT COURT

 2                    FOR THE DISTRICT OF HAWAII

 3   PETER G. SEBALA,              )   CIVIL NO. 04-00404SPK-LEK
                                   )
 4              Plaintiff,         )   Honolulu, Hawaii
                                   )   February 7, 2006
 5        vs.                      )   10:00 a.m.
                                   )
 6   DR. JAMES G. ROCHE,           )   NON-JURY TRIAL
     Secretary, Department of the  )   VOLUME 1
 7   Air Force,                    )
                                   )
 8              Defendant.         )
                                   )
 9   _____
                   TRANSCRIPT OF NON-JURY TRIAL
10          BEFORE THE HONORABLE SAMUEL P. KING,
             SENIOR UNITED STATES DISTRICT JUDGE
11
     APPEARANCES:
12
     For the Plaintiff:       VENETIA K. CARPENTER-ASUI, Esq.
13                            Haseko Center
                              820 Mililani Street, Suite 812
14                            Honolulu, Hawaii 96813

15
     For the Defendant:       R. MICHAEL BURKE, Esq.
16                            Assistant U.S. Attorney
                              Room 6-100, PJKK Federal Bldg.
17                            300 Ala Moana Boulevard
                              Honolulu, Hawaii 96850
18
                              ERIN WIRTANEN, Major, USAF
19                            Trial Attorney
                              Air Force Legal Services Agency
20                            General Litigation Division
                              1501 Wilson Blvd., 7th Floor
21                            Arlington, Virginia 22209

22
     Official Court Reporter:  Cynthia Fazio, RMR, CRR
23                             United States District Court
                               P.O. Box 50131
24                             Honolulu, Hawaii 96850

25   Proceedings recorded by machine shorthand, transcript produced
     with computer-aided transcription (CAT).
</pre>

**EXHIBIT A**

1    Q    Neither of Mr. Sebala's trainers informed you that there

2    was any problem with Mr. Sebala getting certified on any of the

3    machinery, correct?

4    A    Yes.

5    Q    At the time you hired Mr. Sebala, you were informed that

6    he had 26 to 27 years of experience working at Oahu Sugar

7    Company in the tire maintenance shop, correct?

8    A    That's correct.

9    Q    The position Mr. Sebala was hired for temporary one-year

10   mobile equipment servicer had been vacant for one year prior to

11   his hire, correct?

12   A    That's correct.

13   Q    During the course of Mr. Sebala's temporary one-year

14   appointment as a mobile equipment servicer, he did not receive

15   a single disciplinary action; is that correct?

16   A    That is correct.

17   Q    Temporary one-year employees are entitled to sick leave,

18   correct?

19   A    Yes, they are.

20   Q    Please explain what type of sick leave benefits temporary

21   one-year employees are eligible for.

22   A    They earn sick leave at four hours a pay period.

23   Q    Mr. Sebala began work on January 28th, '02.  Approximately

24   how many sick days would he have accrued by August 28th, '02?

25   A    I can't tell you.  I don't have a calculator.

1    a civilian progress review worksheet, correct?

2    A    That is correct.

3    Q    Please turn to Exhibit 75-86.

4         Do you have it, Mr. Nunes?

5    A    Yes, I do.

6    Q    What is this document?

7    A    It's called an Air Force Form 860B.

8    Q    Whose handwriting is on this page?

9    A    That is my handwriting.

10   Q    Whose signature is at the bottom left of the page?

11   A    That is my signature.

12   Q    What is the date on the bottom right of the page?

13   A    It says 10/3/02.

14   Q    Was that about the date you prepared this document?

15   A    Yes, it was.

16   Q    Who typed the words "has met required skill level"?

17   A    I did that.

18   Q    Who wrote the words by hand "good job," apostrophe?

19   A    I did that also.

20   Q    Who placed the Xs down the middle between the columns

21   "needs significant improvement" and "needs little or no

22   improvement"?

23   A    I did that.

24   Q    This form is dated after Mr. Sebala called in sick on

25   8/28/02, correct?

1    one-year term position, correct?

2    A    I'm not sure about that.  He wasn't under me.

3    Q    He remained on the job after Mr. Sebala left, correct?

4    A    Yes.

5         THE COURT:  Who did?

6         MS. CARPENTER-ASUI:  Chris Vargas, another employee,

7    Your Honor.

8         THE COURT:  How do you spell that last name?

9         MS. CARPENTER-ASUI:  V-A-R-G-A-S.

10   BY MS. CARPENTER-ASUI:

11   Q    From your observation of Christopher Vargas and Mr. Sebala

12   during the period they worked -- both worked there from 1/02 to

13   1/03, who appeared older to you, Mr. Sebala or Chris Vargas?

14   A    I -- you know, I have a problem with age.  I -- age is not

15   relevant to me in any case.  I really don't care how old people

16   are.  So I couldn't tell you.  I'll be guessing.

17   Q    Mr. Nunes, I'll represent to you that the record

18   establishes and it's undisputed that on 5/3/03, Chris Vargas

19   was 25 years old.  Mr. Sebala was 53 years old, more than twice

20   his age.

21        Is it still your testimony to this court that you are

22   unable to determine which man was older than the other?

23   A    You know, I'll be second-guessing, you know, just apples

24   and oranges, you know.  I -- yes, I -- you know, I won't take a

25   poke at it.

1    Q    In 2003, did you know a supervisor for the vehicle

2    operation section on the vehicle operation side of the squadron

3    named Ricky Padua?

4    A    Yes.

5    Q    Did you learn that supervisor Ricky Padua was the father

6    of Chris Vargas' girlfriend, the woman he later married?

7    A    Yes.

8    Q    Isn't it true that supervisor Ricky Padua told you that he

9    was related to Chris Vargas?

10   A    Yes, he did.

11   Q    When did you first learn that Mr. Sebala filed an age

12   discrimination case accusing you of committing age

13   discrimination against him?

14   A    I can't recall the date.

15   Q    Can you recall the year?

16   A    Not even that.  Sorry.

17   Q    At some point after January 28th, '03, when Mr. Sebala

18   left employment because his one-year term ended, you learned

19   that Mr. Sebala's temporary position became available as a

20   permanent position, correct?

21   A    That's correct.

22   Q    On at least two occasions you approached Christopher

23   Vargas and asked him to apply for Mr. Sebala's job, which was

24   now open as a permanent mobile equipment servicer position,

25   correct?

1    A    That's correct.

2              THE COURT:  You asked him to apply?

3              THE WITNESS:  Yes.

4    BY MS. CARPENTER-ASUI:

5    Q    You approached him while he was at a mobile equipment --

6    strike that.

7              You also told Christopher Vargas:  "You need to go to

8    the website and put your application in"?

9    A    Yes, I did.

10   Q    You knew that you were the selecting official for

11   Mr. Sebala's old job, which was now open as a permanent mobile

12   equipment servicer position, correct?

13   A    Correct.

14   Q    You did not inform Mr. Sebala or the other one-year

15   temporary employee Ron Yamashita, whose position also ended,

16   about the mobile equipment servicer job, did you?

17   A    No, I didn't.

18   Q    Why didn't you inform those other employees?

19   A    I didn't feel I had to.

20   Q    You had their contact information in your personnel file

21   in your office, but you testified you didn't bother to look at

22   it, correct?

23   A    That's correct.

24              THE COURT:  Do you have to post a notice?

25              THE WITNESS:  Yes.

1             THE COURT:  Job opens like that.

2             THE WITNESS:  Yes.  We -- I did have a meeting -- can

3    I explain, sir?

4             THE COURT:  You had a meeting?

5             THE WITNESS:  Yeah, I had a meeting with shop

6    personnel, and I asked everybody if they knew anybody that

7    wanted to apply for the position since it was open, to have

8    them go on the web and put their names in.

9             THE COURT:  But Vargas you spoke to personally?

10            THE WITNESS:  Yes, 'cause he had saw me earlier

11   that -- he mentioned to me that he was interested in the job.

12   BY MS. CARPENTER-ASUI:

13   Q    And just to confirm, you approached Mr. Vargas on two

14   occasions and told him to apply for the job?

15   A    Yes.  Yes.

16   Q    And in fact, you hired Mr. Vargas to fill Mr. Sebala's old

17   position, which was now a permanent mobile equipment servicer

18   job, correct?

19   A    Yes, I did.

20   Q    You did not interview all of the applicants, did you?

21   A    No.

22   Q    But you did interview Mr. Vargas for the position, didn't

23   you?

24   A    No, I did not.

25   Q    Do you have any explanation why Mr. Vargas testified under

```
 1   A    Yes.

 2   Q    And you believe that's why Mr. Oyadomari would say that

 3   you said you hired Christopher Vargas because he's younger, he

 4   would commit perjury and risk going to jail because you gave

 5   him a written reprimand?

 6   A    I suppose so.

 7   Q    What year did you give him that written reprimand?

 8   A    I'm not sure of the date on that one.

 9             THE COURT:  That's Oyadomari?

10             MS. CARPENTER-ASUI:  Yes, Your Honor.

11             THE COURT:  You gave Mr. Oyadomari a written

12   reprimand?

13             THE WITNESS:  Yes, I did.

14             THE COURT:  But that was before this supposed

15   conversation you had about why you hired Vargas?

16             THE WITNESS:  Yes, it was.

17   BY MS. CARPENTER-ASUI:

18   Q    Isn't it true that you approached Michael Oyadomari while

19   he was working in his stall in the tire shop and told him that

20   Mr. Sebala threatened to file a discrimination case against

21   you?

22   A    I don't recall saying anything like that to him.

23   Q    Do you know why Mr. Oyadomari would testify to that under

24   oath?

25             MAJOR WIRTANEN:  Objection.  Asking --
```

1           THE COURT:  Why should he know that?  You're asking

2     him to guess.

3           MS. CARPENTER-ASUI:  Withdrawn, Your Honor.

4     BY MS. CARPENTER-ASUI:

5     Q    Isn't it true that you approached Ace Soares and told him

6     that Mr. Sebala filed a discrimination case against you and

7     that's why you wanted a written statement from him two years

8     after the fact?

9           MAJOR WIRTANEN:  Objection, compound.

10          THE COURT:  Yeah --

11          MS. CARPENTER-ASUI:  I'll break it down, Your Honor.

12          THE COURT:  Getting complicated.

13    BY MS. CARPENTER-ASUI:

14    Q    Isn't it true that you approached Ace Soares and told him

15    that Mr. Sebala filed a discrimination case against you?

16    A    I believe I did.

17    Q    Isn't it true that you also approached Robin Hastalero and

18    told him that Mr. Sebala filed a discrimination case against

19    you?

20    A    I can't recall that.

21    Q    Isn't it true you also approached Darrell Lim and told him

22    that Mr. Sebala filed a discrimination case against you?

23    A    Again, I can't recall those.

24    Q    Isn't it true you also approached Alan McGaniss and told

25    him that Mr. Sebala filed a discrimination case against you?

1   A    No, I can't recall that.

2   Q    You can't recall; does that mean it is possible but you

3   just don't recall?

4   A    You know, I don't think it happened.

5   Q    Isn't it true that two years after December 12th, 2002,

6   you asked Mr. Soares to write up a statement about Mr. Sebala?

7   A    Yes, I did.

8   Q    And that was to assist you in responding to the EEO age

9   discrimination complaint, correct?

10  A    I really -- I realize that that is correct, yes.

11  Q    And you typed that statement for Mr. Soares, correct?

12  A    I did the typing, yes.

13  Q    And you translated Mr. Soares' explanation to you of what

14  happened into your words and typed them onto the paper,

15  correct?

16  A    I did translate what he told me 'cause he has a hard time

17  of explaining himself.

18  Q    Would you please turn to Exhibit 75-78.  Have you ever

19  seen this document before?

20  A    Yes.

21  Q    What is this?

22  A    This is that Memo for Record that Ace and I formulated.

23  Q    But you typed it up, correct?

24  A    I typed it out, yes.

25  Q    And Mr. Soares signed it after you typed it up?

1    A    Yes, he did.

2    Q    And basically the memo is about words spoken by Mr. Sebala

3    to Mr. Soares, correct?

4    A    Yes.

5    Q    And the words were:  "What?  You like something?"  And

6    that was the "it," right, no other words?

7    A    No other words.

8         MS. CARPENTER-ASUI:  Okay.  Your Honor, plaintiff

9    moves to introduce 75-78 into evidence.

10        MAJOR WIRTANEN:  No objection.

11        THE COURT:  Say that again.

12        MS. CARPENTER-ASUI:  Plaintiff moves to introduce it

13   into evidence.

14        MAJOR WIRTANEN:  No objection.

15        THE COURT:  It's in evidence.

16   (Plaintiff's Exhibit 75-78 was received in evidence.)

17        THE COURT:  That's "it" being Exhibit 75, Page 78.

18   BY MS. CARPENTER-ASUI:

19   Q    You and Mr. Soares are friends outside of work, correct?

20   A    Not really.  We don't socialize.

21   Q    You don't socialize with Mr. Soares?

22   A    No.

23   Q    Were you the best man at his wedding ceremony?

24   A    Yes, I was.

25   Q    Isn't it true that you said to Michael Oyadomari when you

1    asked him to train Mr. Sebala that:  "Mr. Sebala was an expert

2    already from Oahu Sugar Company, go in there and watch how he

3    runs the machines"?

4    A    No, I did not say that.

5    Q    Isn't it true that you asked Mr. Oyadomari how Mr. Sebala

6    was doing regarding his job performance in the tire shop?

7    A    Yes, I did.

8    Q    And isn't it true that Mr. Oyadomari told you that:

9    "Mr. Sebala was doing good, there was no need to train him, no

10   need to teach him nothing"?

11   A    Not in those words.  He just said that Mr. Sebala was okay

12   on the machines.

13   Q    Mr. Nunes, you selected Christopher Vargas for the

14   permanent mobile equipment servicer job based on what?

15   A    Based on the reviewing the resumes and the elements of the

16   job description and you needed -- can I explain further?

17   Q    Yes.

18   A    Okay.  I -- I look at the qualifications for one thing,

19   you know, work experience, how much experience they have

20   concerning the job.  I also look at the individual as a whole.

21   I take the whole person into account.  I look at what kind of

22   character that person is, what kind of worker he is, what kind

23   of work ethics he have, how is his relationship with

24   management, how is his relationship with fellow workers, how is

25   his attitude towards our mission on Hickam Air Force Base.

1          So with that in mind, I look at the whole picture.

2    The whole -- the whole individual.

3    Q    What was it about Mr. Vargas' resume, if anything, that

4    was more impressive to you than Mr. Sebala's resume?

5    A    It wasn't so much the resume.  They were kind of like

6    almost even.

7    Q    Mr. Sebala's resume indicated that he had 26 to 27 years

8    of work experience at Oahu Sugar in the tire shop, and you're

9    aware that he had another year of experience as a temporary

10   mobile equipment servicer, so that would give him a total of 28

11   years of experience --

12          MAJOR WIRTANEN:  Objection.

13   BY MS. CARPENTER-ASUI:

14   Q    -- in a tire shop, correct?

15          THE COURT:  Yeah, you're making a speech.

16          MAJOR WIRTANEN:  And that's a mischaracterization of

17   the evidence.

18          THE COURT:  Reduce it to a question.  I sustain the

19   objection.

20          MS. CARPENTER-ASUI:  Yes, Your Honor.

21   BY MS. CARPENTER-ASUI:

22   Q    How many years of experience did Mr. Sebala's resume

23   indicate he had at Oahu Sugar?

24   A    He had 20-plus years.

25   Q    And how many years of experience did he have working in

1    temporary mobile equipment servicer job?

2    A    He had that one year.

3    Q    So 20-something years, correct?

4    A    Right.

5    Q    How many years of experience did Mr. Vargas have according

6    to his resume?

7    A    About six years.

8    Q    Six years.  And how old was Mr. Vargas on the date he

9    submitted that resume in 2003 to you?

10   A    I have no idea.

11   Q    The record reflects he was 25 years of age, correct?

12   A    I don't know.  You telling me that.  Yeah, I suppose so if

13   he was.

14   Q    So, is it still your testimony that their experience was

15   even?

16   A    The experience side, no.  But let me explain?

17        THE COURT:  Yes, she asked you whether they were even,

18   you can explain.

19        THE WITNESS:  As far as the qualities of each

20   individual, that's where the difference lies.

21   BY MS. CARPENTER-ASUI:

22   Q    Which qualities?

23   A    Those qualities that I mentioned to you:  Their work

24   ethics, their attitudes, their ability to relate to others.

25   Q    Okay.  We're going to go down that list.  Number two, you

1     said the elements of the job description?

2     A     Yes.

3     Q     Tell us what elements of the job description weighted Mr.

4     Vargas compared to Mr. Sebala.

5     A     They both -- as far as Mr. Vargas, yeah, he was --

6     according to his resume, he was able to do and meet all the

7     elements of the position description, he was able to change

8     tires on various equipment, he was able to do tire repairs,

9     tire services, he was able to use various test equipments and

10    analyzers, et cetera.  And the type of equipment that he worked

11    on was a wide variety of equipment as well.

12    Q     You are you done?

13    A     Yes.

14    Q     Mr. Vargas never worked in a tire shop, correct?

15           THE COURT:  Before.

16    BY MS. CARPENTER-ASUI:

17    Q     Before?

18    A     Before, yes, he did.

19    Q     What tire shop did he work at?

20    A     There was two tire companies that he worked for on the

21    Mainland.  I can't recall the names.

22    Q     Are you sure he worked for two tire companies on the

23    Mainland?

24           MAJOR WIRTANEN:  Objection.  Witness has answered.

25           THE COURT:  You got the answer.  You didn't like it.

1          MS. CARPENTER-ASUI:  Withdrawn, Your Honor.

2    BY MS. CARPENTER-ASUI:

3    Q    Isn't it true that Mr. Vargas worked in auto body paint

4    shops?

5    A    Yes, he did.

6    Q    And he had some military experience, correct?

7    A    Yes, he does.

8    Q    What qualifications, that was your third quality, did

9    Mr. Vargas have that were superior to Mr. Sebala?

10   A    As far as time, yeah, in the field, it's obvious that

11   Mr. Sebala had 20-plus years versus Mr. Vargas' six.  And

12   that's the extent of that.

13   Q    Well, that doesn't answer my question.  My question was:

14   You said qualifications was one of the qualities that you

15   determined Mr. Vargas was superior to Mr. Sebala.

16   A    Yes.

17   Q    But you just testified that the 20-plus years were more

18   than the six years?

19   A    That's part of it.  It's not the whole picture.

20   Q    Work experience concerning the job was your number four.

21   What superiority did Mr. Vargas have over Mr. Sebala's 28 years

22   of experience?

23   A    Again, Mr. Vargas worked in various shops on various

24   equipment doing various type of work.  And in that sense, yes,

25   he is superior to Sebala if Sebala only stayed in one place for

1    20-plus years.

2    Q    And it's true that when Mr. Vargas worked in the auto body

3    shops, he did automobile painting, correct?

4    A    That's correct.

5    Q    Next you said the individual as a whole.  How was

6    Mr. Vargas superior to Mr. Sebala?

7    A    Okay.  I had a year to observe both candidates, Mr. Sebala

8    and Mr. Vargas.  And Mr. Vargas worked in a stall next to my

9    office as a auto body man in the allied trade section of our

10    shops.  So every day I'd see Mr. Vargas there working.  He had

11    good work ethics, he had a good attitude towards his job, he

12    had no problems with any employees, any fellow workers.  He

13    just showed a lot of positive things about his job that he

14    portrayed when he worked every day.  He was a hard worker.

15    Q    Mr. Vargas didn't work under your supervision, did he?

16    A    No, he didn't.

17    Q    How many hours of the day would you spend watching

18    Mr. Vargas performing his job duties?

19    A    I'm in and out of my office, like, I could go in and out

20    of there, say, about on the hour, maybe about five to ten

21    times.  So, every time I go out there, I looking over at the

22    stall and I see Mr. Vargas working.  So I'll stand there and

23    just observe him, you know, what he's doing.

24    Q    You said he had no problems with fellow workers.  Isn't it

25    true that Mr. Vargas will testify that he was shunned by his

1-43

1      THE COURT:  Well, you didn't say that.

2      MS. CARPENTER-ASUI:  I'll ask it again, Your Honor.

3  BY MS. CARPENTER-ASUI:

4  Q    Did you write up Mr. Vargas for insubordination to you?

5  A    I wrote -- I gave him --

6      MAJOR WIRTANEN:  Your Honor, objection.  That's --

7  goes into a line of questioning that was after Mr. Vargas was

8  hired to which --

9      THE COURT:  I understand that's subject to a Motion to

10  Strike.

11     MAJOR WIRTANEN:  Sir, when would you like us to give

12  that Motion to Strike?

13     THE COURT:  I made it for you.

14     MAJOR WIRTANEN:  Okay.

15     THE COURT:  Go ahead.

16     MS. CARPENTER-ASUI:  Am I stricken or can I keep

17  going?  I'm not sure what the status is.

18     THE COURT:  All the information you're trying to get

19  as to what Mr. Vargas' relation was with his bosses after he

20  was hired is subject to a Motion to Strike.  Which I will

21  decide eventually.

22     MS. CARPENTER-ASUI:  Oh, okay.

23  BY MS. CARPENTER-ASUI:

24  Q    So you did write up Mr. Soares -- Mr. Vargas for

25  insubordination against you, correct?

1  A    I gave him a letter of counseling, a letter of record or

2  something like that.

3  Q    And what was the dispute between yourself and Mr. Vargas

4  about?

5  A    Actually the letter that I gave him was a dispute between

6  him and Mr. Soares.

7  Q    But you yourself wrote him up for insubordination,

8  correct, against you?

9  A    No.

10  Q    No?

11  A    I wrote a comment on his 971.

12  Q    Right.

13  A    But I sat down and I counseled him on that issue, yes.

14  Q    And you wrote down on that 971 that he was insubordinate

15  to you and counseled for that, correct?

16  A    In that case, yes.

17  Q    What did he say to you that was insubordinate?

18  A    He -- he was angered at something that day, and I wasn't

19  sure.  I went there with all ears trying to listen to what he

20  had to say.  A lot of things came out of his mouth.

21  Q    And what were they exactly, the exact words, please?

22  A    It sounded like he spoke maybe -- kind of like maybe under

23  his breath, I couldn't say for sure what he said.  It wasn't,

24  you know, it wasn't hi or good-bye.

25  Q    It was the F-word, correct?

```
 1   A    I -- I suppose so, yeah.

 2   Q    And he said that to you, his superior officer, correct?

 3   A    Well, he -- he said it under his breath.  It looks like

 4   he -- he kind of turned away and he walked away like, you know,

 5   out of anger.

 6   Q    But you heard it, correct?

 7   A    Just a little.  I didn't, you know, hear it real clearly.

 8   It was under his breath, but he did -- it sounded like that's

 9   what he said.

10   Q    So are you saying he didn't say it, you're not sure?

11   A    No, no, it sounded like he may have said that.

12   Q    But you're not sure now?

13   A    No, it's not that I'm not sure.  It's just was muffled,

14   that's all.

15   Q    Okay.  And then you also wrote him up for an incident with

16   acting supervisor Ace Soares, correct?

17             THE COURT:  This is all subject to a Motion to Strike.

18             MS. CARPENTER-ASUI:  Yes, Your Honor.

19             MAJOR WIRTANEN:  Your Honor, in the interest of

20   judicial efficiency, we would ask that the honorable court

21   decide the motion and not hear this evidence, because I believe

22   that the plaintiff is going to ask a lot -- several hours'

23   worth of questioning on this topic to a few witnesses.

24             THE COURT:  How much time are you going to spend on

25   it?
```

1-46

1          MS. CARPENTER-ASUI:  This is my last question to this

2    witness on it, Your Honor, because he -- he wrote --

3          THE COURT:  I'll let you proceed.  When you finish

4    this line, let me know so I can box that testimony from the

5    time you started to then.

6    BY MS. CARPENTER-ASUI:

7    Q    What did Mr. Vargas say to Ace Soares that caused you to

8    write him up?

9    A    They had a heated argument about something.  I -- I later

10   found out through my investigation that Mr. Soares was teasing

11   him about something and Mr. Vargas blew up.

12   Q    What does that mean, blew up?

13   A    "Blew up" means he lost his temper.

14   Q    And what happened?

15   A    And they had a heated argument as a result of that.  So

16   I -- I heard the yelling match out there and I went to

17   investigate, find out what was going on.  And I stopped the

18   two -- both of them and I took them in my office, and I sat

19   down and I talked to them.

20         THE COURT:  And wrote it up?

21         THE WITNESS:  And wrote it up.

22   BY MS. CARPENTER-ASUI:

23   Q    What words did Mr. Vargas use against Mr. Soares?

24         THE COURT:  If you heard him.

25         THE WITNESS:  You know, again, he was -- you know, he

1    used the F-word, you know.

2    BY MS. CARPENTER-ASUI:

3    Q    Did Mr. Sebala ever use the F-word against you?

4    A    No.

5    Q    Did you ever write up Mr. Sebala for insubordination of

6    any kind?

7    A    I just --

8         THE COURT:  You just got through talking about it,

9    Sebala.

10        MS. CARPENTER-ASUI:  No, this one, Your Honor.

11        THE COURT:  Oh, wait a minute, you through with all

12   that other stuff about --

13        MS. CARPENTER-ASUI:  Just about.  Just trying to find

14   the exhibit, Your Honor.

15   BY MS. CARPENTER-ASUI:

16   Q    Did Mr. Sebala ever --

17        THE COURT:  If you're through with the stuff about

18   Vargas, all right, that testimony from the beginning until now

19   is subject to a Motion to Strike.

20        Now we're on a new trip.

21        MS. CARPENTER-ASUI:  Can I ask the witness to turn to

22   Exhibit 9A.

23        THE COURT:  Exhibit?

24        MS. CARPENTER-ASUI:  9A.

25        THE COURT:  9A.  Just so the record will be clear,

1    what we're talking about is the testimony of Mr. Vargas'

2    actions, if any, after he was hired?

3              MS. CARPENTER-ASUI:  Yes, Your Honor, that's correct.

4    BY MS. CARPENTER-ASUI:

5    Q    And so, Mr. Nunes, do you see 9A?

6    A    Yes, I do.

7    Q    Is this your write-up of Mr. Vargas after he was hired?

8    A    Yes, it is.

9    Q    And how about the next one, 10?

10             THE COURT:  A?  Oh, okay.

11   BY MS. CARPENTER-ASUI:

12   Q    And the next Exhibit Number 10, that's another write-up

13   after he was hired for the full -- permanent job, right?

14   A    Yes.

15             MS. CARPENTER-ASUI:  Your Honor, plaintiff moves to

16   introduce Exhibit 9A and 10, subject to your ruling on the

17   Motion to Strike.

18             THE COURT:  Well, Exhibit 10 is the same thing we've

19   been talking about.

20             And exhibit -- this is still all that stuff after he

21   was hired.

22             MS. CARPENTER-ASUI:  Yes, Your Honor.  We're trying to

23   move them into evidence subject to your Motion to Strike.

24             THE COURT:  Subject to a Motion to Strike, add it to

25   the subsequent -- earlier testimony.

1-54

1    Q    Mr. Nunes, would you agree that it's in your best interest

2    to deny making the statement that you selected one applicant

3    over the other because of his age?

4    A    I guess so, yes.

5    Q    Isn't it true that Mr. Oyadomari told you that Mr. Vargas

6    was inexperienced and unable to handle the tire-changing

7    machine?

8              THE COURT:  Who told you?

9              MS. CARPENTER-ASUI:  Oyadomari told Mr. Nunes.

10            THE COURT:  Before you hired him?

11            MS. CARPENTER-ASUI:  After, Your Honor.

12            THE COURT:  Oh, after you hired him.  Well, this will

13    be subject to a Motion to Strike.

14            MS. CARPENTER-ASUI:  But, Your Honor, this goes to

15    Mr. Nunes' testimony that this Vargas is totally qualified, but

16    we're going to hear a lot of evidence from Mr. Vargas himself

17    that he couldn't do the job.

18            THE COURT:  We'll get to Mr. Oyadomari when we get to

19    him.

20            MS. CARPENTER-ASUI:  Yes, Your Honor.

21            THE COURT:  Did he tell you that?

22            THE WITNESS:  I don't recall that statement.

23            THE COURT:  Okay.

24            MS. CARPENTER-ASUI:  I'm going to go to the deposition

25    transcript at this time.  Page 76?

1-55

1          THE CLERK:  What line, please?

2          MS. CARPENTER-ASUI:  Line 25.

3          THE CLERK:  Thank you.  So it's all the way on the

4    bottom, correct?

5          MS. CARPENTER-ASUI:  Yes.

6          THE COURT:  What page?

7          MS. CARPENTER-ASUI:  Your Honor, Page 76, Line 25 at

8    the bottom.  And I'll read it out loud.

9    BY MS. CARPENTER-ASUI:

10   Q    "Question:  Do you recall Mr. Oyadomari telling you that

11   he told you that Mr. Vargas was inexperienced and was unable to

12   handle the tire changing machine?

13          "Answer:  I recall Mike mentioning that, yes."

14          Was that your testimony under oath?

15   A    Yes, it was.  I guess I didn't understand the question

16   fully.

17   Q    Isn't it true that Mr. Soares also told that you

18   Mr. Vargas was having difficulty operating the tire-changing

19   machine?

20          THE COURT:  Before he was hired?

21          MS. CARPENTER-ASUI:  After, Your Honor.

22          THE WITNESS:  I don't recall Soares mentioning that to

23   me.

24   BY MS. CARPENTER-ASUI:

25   Q    Isn't it true that Mr. Vargas himself admits that it took

1   him almost three months to get control of the tire-changing

2   machine?

3   A      Yeah, but the -- can I say something on that?

4   Q      Yes.

5           THE COURT:  Yeah, sure.

6           THE WITNESS:  The time it takes to qualify yourself or

7   get certified on a piece of equipment is irrelevant, yeah,

8   because when -- as I -- I'm the certifier -- when I see that

9   the person is totally proficient on that equipment, that's when

10  I decide he is certified.  Even under the advisement of my

11  trainers, people that I assign to that, to train the

12  individual, I'll go over there and actually look at the

13  operation, how -- how the individual is doing.

14          MS. CARPENTER-ASUI:  Nothing further, Your Honor.

15          THE COURT:  Cross-examine --

16          MAJOR WIRTANEN:  Yes, Your Honor.

17          THE COURT:   -- Major?

18                        CROSS-EXAMINATION

19  BY MAJOR WIRTANEN:

20  Q      Good morning, Mr. Nunes.

21  A      Good morning.

22  Q      Mr. Nunes, what is your date of birth?

23  A      September 30th, 1949.

24  Q      And are you aware that the plaintiff, Mr. Sebala, was also

25  born in 1949?

1    A    Specifically changing tires, you talking about?

2    Q    Well, did you make the statement that Mr. Sebala had a lot

3    of experience as a tire man?

4    A    Yes.

5    Q    At times were you Mr. Sebala's acting supervisor?

6    A    In December 2002.

7    Q    Did Mr. Sebala ever ask you any questions about how to

8    perform his job duties?

9    A    No.

10    Q    Did it ever appear to you that Mr. Sebala did not know how

11    to perform his job duties?

12    A    The job has a tire position and mechanic, there's two

13    portions to that job.  Specifically, which one you want me to

14    answer?

15    Q    Well, did it ever appear to you that Mr. Sebala did not

16    know how to perform any of his job duties?

17    A    No, he was pretty proficient in the tires.  On the

18    automotive side he had a little trouble.

19    Q    What does that mean?

20    A    He wasn't as proficient in tires as he was as a automotive

21    mechanic.

22    Q    He was not as proficient in tires as he was in automotive?

23    A    No, he wasn't as proficient doing automotive work as he

24    was in tires.

25    Q    What automotive work was that?

1  A    He was working on a bus one time and seemed like he was

2  having some trouble.

3  Q    What kind of trouble?

4  A    He was working on the dashboard, trying to remove the

5  dashboard.

6  Q    And what was the problem; it was stuck?

7  A    Yeah, look like he just was having trouble getting it up,

8  getting it off.

9  Q    Okay.  Any other problem?

10  A    No.

11  Q    Okay.  So Mr. Sebala knew how to perform his job working

12  with tires from your observations, correct?

13  A    Yes.

14  Q    On 12/13/02, were you the acting supervisor in the tire

15  shop?

16  A    Yes.

17  Q    Do you recall Mr. Sebala stating to you the words:  "What,

18  you like something?"

19  A    Yes.

20  Q    Back on 12/13/02, you did not write anything down about

21  that incident, correct?

22  A    No.

23  Q    You did tell Supervisor Nunes about the incident, though,

24  correct?

25  A    Yes.

1    Q    But Supervisor Nunes did nothing on the date you told him

2    about it, correct?

3    A    Not that I know of, no.

4    Q    And on that date Supervisor Nunes did not tell you:

5    "Write something down about that incident," correct?

6         MAJOR WIRTANEN:  Objection, Your Honor.  At this point

7    the plaintiff is leading this witness.  This is a mere

8    co-worker, this is not a management official, and there's --

9         THE COURT:  She's right, you know.

10        MS. CARPENTER-ASUI:  Yes, Your Honor.  Okay.

11   BY MS. CARPENTER-ASUI:

12   Q    Did -- did you write down anything about the 12/13/02

13   incident?

14   A    At that time or later?

15   Q    Back when it happened in December '02.

16   A    No.

17   Q    Now, three years later, in 2005, did you write down

18   something what happened?

19   A    Yes.

20   Q    And why did you three years later write down something

21   about it?

22   A    Mr. Nunes asked me to.

23   Q    Okay.

24        THE COURT:  Who did?

25        THE WITNESS:  Mr. Randy Nunes.

1-77

1    BY MS. CARPENTER-ASUI:

2    Q    And did he tell you why he needed something written down

3    three years later?

4    A    Yes.

5    Q    What did he say?

6    A    That he had a discrimination complaint from Peter Sebala

7    and if I could write down -- write down what happened back in

8    December '02.

9    Q    And did Supervisor Nunes ask you if you had heard of any

10   other incidents involving Mr. Sebala?

11   A    I think he mentioned if there was anything else that

12   happened between me and Mr. Sebala, but the answer was no.

13   Q    Okay.

14   A    That was the only incident.

15   Q    And how long did it take you and Supervisor Nunes to work

16   on that statement?

17   A    Between 30 to an hour.

18   Q    Who did the typing of the statement?

19   A    Mr. Nunes.

20   Q    Now, that statement had no date on it.  Do you know why

21   there was no date on your statement?

22   A    No.

23   Q    Did you and Mr. -- Supervisor Nunes discuss putting a date

24   on the statement that would reflect three years later?

25   A    No.

1  evidence.  These words came from nowhere.

2       THE COURT:  Yeah, I don't know that that has -- never

3  been testified to.

4       MS. CARPENTER-ASUI:  Let me ask Mr. Soares.

5       THE COURT:  Did Mr. Vargas ever say something like

6  that to you?

7       THE WITNESS:  Not "bitch."

8       THE COURT:  No.

9       THE WITNESS:  I never heard the word "bitch."

10      THE COURT:  He didn't say "bitch."

11      MS. CARPENTER-ASUI:  Okay.  I'll leave that off.

12 BY MS. CARPENTER-ASUI:

13 Q    So what about the rest of it?

14 A    His words was:  "Worry about your F'n self.  Worry about

15 your F-U-C-K self."

16 Q    Did you write a statement about that?

17 A    I wasn't asked to write a statement, no.

18 Q    Mr. Nunes never asked you to write up a statement about

19 Mr. Vargas?

20 A    No, I had a talk with -- Mr. Nunes talked to me and

21 Vargas.

22 Q    But he only asked you to write up a statement about

23 Mr. Sebala?

24 A    Yes.

25      THE COURT:  Mr. Vargas hasn't sued anybody.

1           MS. CARPENTER-ASUI:  Yes, Your Honor.

2    BY MS. CARPENTER-ASUI:

3    Q    When you wrote that statement, you were on duty working

4    for the federal --

5           THE COURT:  Only need paper when you're in a lawsuit.

6           MS. CARPENTER-ASUI:  Yes, Your Honor.

7    BY MS. CARPENTER-ASUI:

8    Q    But when you wrote that statement, you were on duty

9    working for the federal government, right?

10   A    Yes.

11   Q    And you were being paid?

12          THE COURT:  You mean now?

13          MS. CARPENTER-ASUI:  No, when he was writing the

14   statement about Mr. Sebala.

15   BY MS. CARPENTER-ASUI:

16   Q    You were being paid?

17   A    Yes.

18   Q    And Randy Nunes was the supervisor that asked you to write

19   that statement, correct?

20   A    Yes.

21   Q    Do you have any evidence to the statement -- you said that

22   Michael Oyadomari and Mr. Sebala are friends.  What evidence do

23   you have that they are some kind of friends?

24   A    What I said in my deposition was when you work with

25   someone, you become friends.  I was friends with Peter, too,

1   A    Pharr-San Juan-Alamo High School.

2   Q    In what state?

3   A    Texas.

4   Q    Would you list each of your employers that you worked for

5   after high school beginning with your first job after high

6   school up to the present, and tell us the dates.

7   A    United States Army, June '95 to December 1997.

8   Quintinilla Security.

9   Q    Spell.

10  A    Q-U-I-N-T-I-N-I double L-A.

11  Q    Security?

12  A    Yes.

13  Q    Dates?

14  A    I'm not too sure on the dates.

15  Q    Years?

16  A    1998, in about that year, 'til 1998.

17  Q    Next?

18  A    And then Simon -- Simon, S-I-M-O-N, Corporation, 1998 to

19  1999.  Then Ryder Transportation, 1998 to 1999.  Then Laidlaw

20  Transit, 1999 to 2000.  And Godinez, G-O-D-I-N-E-Z, Customs

21  Brokerage, that was from 2000 to 2001.  Then Thanks Auto Body,

22  2001 -- I mean, correction, 2000 to 2001.  And then Hickam Air

23  Force Base, 2002 to the present.

24  Q    What job titles did you hold when you worked for the U.S.

25  Army from June '95 to 12/97?