1   experience?

2   A    Mr. Vargas or --

3   Q    I'm sorry, Mr. Nunes.

4   A    Yes.

5   Q    And when did you and Mr. Nunes talk about your work

6   experience?

7   A    Within my first year as an employee for the Air Force.

8   Q    And what did you tell Mr. Nunes about your work

9   experience?

10  A    That I had experience in the automotive field and as a

11  painter.

12  Q    Did you tell him anything else?

13  A    That I knew how to do tires as well.

14  Q    Did you tell him anything else?

15  A    No.

16  Q    So you told him you had experience in the automotive field

17  as a painter and you knew how to do tires?

18  A    Yes.

19  Q    Did you say any other words to him, Mr. Nunes, about the

20  work experience you had had prior to being there at Hickam?

21  A    Yes, I had told him about my previous positions.

22  Q    What did you tell him?

23  A    It was, you know, in the line that I knew how to do these

24  jobs because I had worked these positions before.

25  Q    And when you had this conversation with him, where did it

1    Q    Did you ever tell him anything else about what prior work

2    experience you had?

3    A    Yes.

4    Q    What?

5    A    As a customs broker.

6    Q    But that has nothing to do with tires or --

7    A    No.

8    Q    -- vehicles?

9         Okay.  Anything else about automotive or painting?

10   A    No.

11   Q    Tires?

12   A    No.

13   Q    And all of the conversations you had, several, would they

14   amount to many hours of discussions or were these short

15   discussions?

16   A    Just brief discussions.

17   Q    And were they ever any formal meetings or just talking in

18   passing?

19   A    Just talking in passing.

20   Q    On what date did you begin working at Hickam Air Force

21   Base?

22   A    I cannot remember the exact date, but it was in January

23   2002.

24   Q    Might it have been January 28th, 2002?

25   A    I believe so.

1   Q    Mobility exercise?

2   A    Yes.

3   Q    And who did you hear this from?

4   A    I heard this from four individuals:  Mr. Eassie Soares,

5   Mr. Nunes, Mr. Robin Hastalero and Mr. Terry Shinjo.

6   Q    Did you see Supervisor Nunes at the mobility exercise?

7   A    Yes, I did.

8   Q    Did Supervisor Nunes say anything to you at the mobility

9   exercise about the permanent mobile equipment servicer job that

10  was opening up?

11  A    Yes.

12  Q    What did he say to you?

13  A    He told me the position was open because Mr. Sebala had

14  been -- I guess his term had or temporary had finished, and

15  that it would be opening up soon.

16  Q    And do you recall him asking you about your experience at

17  that time?

18  A    No.

19  Q    What else did he say to you about that job opening?

20  A    He had stated, you know, he -- he told me Mr. Sebala had

21  been let go, the position would be opening up.  And, you know,

22  I had not known Mr. Sebala had been released, so I was like

23  wow.  And he said he'd tried to do everything he could to -- to

24  extend him, but, you know, I guess it didn't work out or

25  because it was a temporary and now it's permanent.

1    Q    How many times did Supervisor Nunes speak to you about

2    applying for the permanent mobile equipment servicer job?

3    A    I believe once.  Once or twice.  I'm not too sure.

4    Q    Did he advise you to put your application on the web?

5    A    He told me to look into the position.  He did not, you

6    know, say those words, "to apply."  Said:  "Look into the

7    position."

8    Q    How did you learn that you were selected for the permanent

9    mobile equipment servicer job?

10    A    Mr. Nunes called me, let me know that my name was on the

11    list and pretty sure I was going to get the job.  He called me

12    at my other job, so that's how I learned.

13    Q    Did Supervisor Nunes interview you before you received the

14    permanent mobile equipment servicer job?

15    A    Yes.

16    Q    And where did this interview take place?

17    A    In his office.

18    Q    Did he call you to his office for that interview?

19    A    Yes.

20    Q    And then how long after the job interview with Supervisor

21    Nunes did you begin working in the mobile equipment servicer

22    job?

23    A    I believe it was two weeks.  I'm not too sure on that.

24    Q    Did anyone train you in the beginning?

25    A    Yes.  Yes.

1   the employer for doing things.  What's in his mind is not

2   anything to do with --

3   BY MS. CARPENTER-ASUI:

4   Q    Did you --

5        THE COURT:  He could think he was terrible, and they

6   could have thought he was wonderful.  He can think he's

7   wonderful and they could think he was terrible.  That's the

8   more important one.

9   BY MS. CARPENTER-ASUI:

10  Q    Did you ever approach Mr. Nunes and tell Mr. Nunes about

11  the difficulties you were having at work performing your job?

12  A    Yes, I did.  It was about time management.

13  Q    Did you tell Mr. Nunes you had difficulties operating the

14  tire rim changer?

15  A    I -- I don't remember if I did that.

16  Q    Did you tell Mr. Nunes that you could -- you had problems

17  trying to do your workload within the amount of time allotted?

18       THE COURT:  This is after he was hired?

19       MS. CARPENTER-ASUI:  Yes, Your Honor.

20       THE COURT:  Well, of course, this is all subject to a

21  Motion to Strike.

22       You may answer that.

23       THE WITNESS:  Yes, I did.  Basically on time

24  management.

25  BY MS. CARPENTER-ASUI:

1           THE WITNESS:  More.  Sorry, Judge.

2    BY MS. CARPENTER-ASUI:

3           THE COURT:  You get paid for both jobs?

4           THE WITNESS:  No, Judge, I get paid for one, but I do

5    both jobs.

6           THE COURT:  Well, in effect they abolished that job as

7    a separate job?

8           THE WITNESS:  Well, my supervisor says it's under his

9    discretion to use me in that position if he needs me.

10          THE COURT:  That paint job, was there somebody else in

11   that job at one time?

12          THE WITNESS:  Yes, it was an injured employee.

13          THE COURT:  And he or she, or whatever it is, is out?

14          THE WITNESS:  No, he's on permanent -- or temporary

15   light duty.

16          THE COURT:  And that's when you got the job?

17          THE WITNESS:  Yes.

18          THE COURT:  Who gave you that job?

19          THE WITNESS:  Mr. Nunes.  I applied for that job, too.

20          THE COURT:  You applied for it?

21          THE WITNESS:  Yes.

22          THE COURT:  Did he tell you to apply for it?

23          THE WITNESS:  Yes.  He said because of my painting

24   experience, I should apply for it because it's only a temporary

25   promotion, it's not a permanent job.

1-107

1    BY MS. CARPENTER-ASUI:

2    Q    On 3/7/05, you see towards the bottom -- one, two, three,

3    four, five from the bottom?

4    A    I see it.  I see it.

5    Q    It says:  "Counseled employee on losing his temper,

6    swearing, challenging my authority about him taking leave."

7         Was there such an incident involving you?

8         MAJOR WIRTANEN:  Objection again, Your Honor.  This is

9    all post-employment.

10        THE COURT:  I'll let him answer but subject to a

11   Motion to Strike.

12        MS. CARPENTER-ASUI:  Yes, Your Honor.

13        THE WITNESS:  I -- I do not remember the incident.

14        THE COURT:  You don't remember it?

15        THE WITNESS:  Honestly I do not.  I don't remember the

16   incident.

17   BY MS. CARPENTER-ASUI:

18   Q    Okay.  The next one down, 4/12/05:  "Reviewed 860" --

19        THE COURT:  Same ruling.

20   BY MS. CARPENTER-ASUI:

21   Q    -- "feedback with employee.  Continued work on temper

22   control and directives."

23        Do you recall --

24   A    No, I do not.

25        THE COURT:  Anybody ever tell you to control your

1    temper?

2              THE WITNESS:  Mr. Nunes has.  But I don't remember

3    seeing this -- this paper or him counseling me.

4              THE COURT:  But not these events mentioned here?

5    Telling you to control your temper.

6              THE WITNESS:  Yes, he has.

7              THE COURT:  He did tell you that?

8              THE WITNESS:  Yes, he has.

9    BY MS. CARPENTER-ASUI:

10   Q    What did Mr. Nunes say to you?

11   A    To control my -- control my temper.

12   Q    Do you remember why he said that to you?

13   A    No.  No, I do not.

14             THE COURT:  You mean you didn't lose your temper?

15             THE WITNESS:  I don't -- I don't remember the exact

16   incident, so I don't know if I lost my temper on something.  I

17   cannot remember, Your Honor.

18             THE COURT:  You may have?

19             THE WITNESS:  I may have, but I do not remember.

20   BY MS. CARPENTER-ASUI:

21   Q    How about 5/12/05:  "Counseled employee about anger

22   management incident with Ace Soares-Haae, 5/12/05," do you

23   recall that?

24   A    Yes, I recall that.

25   Q    What happened?

1    A    Mr. Soares and I were involved in an argument and we both

2    lost our temper.  Unfortunately, Mr. Nunes -- well,

3    fortunately, Mr. Nunes got involved and we settled the dispute,

4    all three of us.

5    Q    What words did you say to Mr. Soares in that incident?

6            MAJOR WIRTANEN:  Objection again, Your Honor.

7    Relevance.

8            THE COURT:  Yeah, we're going into an awful lot of

9    detail on the side issues.

10           MS. CARPENTER-ASUI:  This is the last question, Your

11    Honor.

12           THE COURT:  That doesn't make it any better.  However,

13    go ahead, subject to a Motion to Strike.

14           THE WITNESS:  Okay.  This incident occurred -- I

15    believe it was Mr. Soares wanted me to go to physical training,

16    which is a voluntary program we have.  I had already arranged

17    for a letter -- a later time with Mr. Nunes.  Mr. Soares kept

18    urging me to go repeatedly, and I finally told him, you know,

19    to leave me alone, mind his own business, and he kept telling

20    me to go.  So I lashed out at Mr. Soares, and that's what this

21    incident is about.

22    BY MS. CARPENTER-ASUI:

23    Q    What were your words to Mr. Soares?

24    A    "To leave me -- to fucking leave me alone, go away, you

25    fuckin' bitch, leave me alone."

```
 1              THE COURT:  Stepfather.  Okay.
 2   BY MS. CARPENTER-ASUI:
 3   Q    Now, how old were you during those nine years you worked
 4   in your stepfather's auto body shop?
 5   A    I began when I was 12, and I worked all the way through
 6   school, until I graduated, until I was 18.  That's six years.
 7   After I got out of the military, when I went back home I lived
 8   with him at home.  So I would still help him at his auto body
 9   shop and still work part-time.
10   Q    So when you were 12 years old, you were working full-time
11   there or would you help your stepfather when you got home from
12   school in the afternoon?
13   A    Yes, I would help him when I would get home from school.
14   Q    And it was an auto body paint shop, correct?
15   A    Yes.
16   Q    Randy Nunes gave you the promotion to painter, didn't he?
17   A    Yes, he did.
18   Q    And you were married in May '03, correct?
19              THE COURT:  May?
20              THE WITNESS:  No --
21   BY MS. CARPENTER-ASUI:
22   Q    May '03?
23   A    No, I was -- was it May?
24              THE COURT:  Can't remember your marriage date?
25              THE WITNESS:  I'm a little nervous right now.  My wife
```

1    O-Y-A-D-O-M-A-R-I.

2                         DIRECT EXAMINATION

3    BY MS. CARPENTER-ASUI:

4    Q    Good afternoon, Mr. Oyadomari.  Would you please state

5    your place of employment?

6    A    Hickam Air Force Base.

7    Q    And what was your hire date?

8    A    May 5th, 1986.

9    Q    What was your assignment in January '02 through January

10   '03?

11   A    Mechanic.

12   Q    And what shop did you work in?

13   A    Maintenance, the mechanic shop.

14   Q    In January '02 through January '03, did you have an

15   opportunity to observe Mr. Peter Sebala in the workplace

16   performing his job duties as a mobile equipment servicer?

17   A    Yes.

18   Q    And were you ever assigned to be Mr. Sebala's trainer?

19   A    No.

20   Q    Mr. -- Supervisor Nunes never asked you to train

21   Mr. Sebala?

22   A    No.

23   Q    Do you know if anyone trained Mr. Sebala?

24   A    Not that I know of.

25   Q    Okay.  Did you ever learn or hear that Mr. Sebala was

1   Q   When Mr. Sebala first began working as a mobile equipment

2   servicer in January '02, did Supervisor Nunes ever say anything

3   to you about Mr. Sebala?

4         THE COURT:  About his work.

5   BY MS. CARPENTER-ASUI:

6   Q   About Mr. Sebala's work?

7         THE COURT:  Just a minute.

8         MR. BURKE:  Object on the basis of hearsay.

9         THE COURT:  Overruled.

10        THE WITNESS:  No, he neva' say nothing about his work.

11        MS. CARPENTER-ASUI:  Let's turn to Mr. Oyadomari's

12   deposition, Page 8.

13        THE WITNESS:  Can I say something?

14   BY MS. CARPENTER-ASUI:

15   Q   Yes.

16   A   He neva' say nothing about his work, but he told me if I

17   can observe Mr. Sebala operating the machine.

18        THE COURT:  Well, wait for a question, Mr. Oyadomari.

19        MS. CARPENTER-ASUI:  Your Honor, that's the answer I

20   was looking for.

21   BY MS. CARPENTER-ASUI:

22   Q   I'm sorry, could you say it again?

23   A   Mr. Nunes asked me if I can observe Mr. Sebala operating

24   the machine.  Yeah.

25   Q   And did you observe Mr. Sebala operating the machine?

1    A    Couple times, yeah, for a while.

2    Q    And did Supervisor Nunes ever ask you for any feedback

3    about Mr. Sebala's work?

4    A    I don't remember.

5    Q    Did you offer Mr. -- Supervisor Nunes any feedback about

6    Mr. Sebala's work?

7    A    No, I don't remember that.

8    Q    Okay.  Let's go to your deposition, Page 8.  Line 12.

9    I'll read -- let's go to Line 10:  "Question:  And then did you

10    report back to Randy and give him, you know, your opinion of

11    Mr. Sebala?

12         "Answer:  Randy came to me and asked me how the guy

13    doing, said he doing good.  No have to train him.  No have to

14    do nothing."

15         Do you recall that?

16    A    Yes.  I remember that now.

17    Q    When you and Mr. Sebala were both working at the tire shop

18    in January '02 through January '03, did you ever socialize

19    outside of work with Mr. Sebala?

20    A    You mean off base?

21    Q    Yes.

22    A    No.

23    Q    How about on base, did you ever socialize with Mr. Sebala?

24    A    Oh, break time we all talk stories, everybody.  Smoke

25    break, yeah.

1    Mr. Sebala for the permanent --

2             THE COURT:  You have to go at it -- you know, he's not

3    a -- you use -- you're treating him as though you're on

4    cross-examination.  You have to start off with direct

5    examination questions.  Did you ever have a conversation with

6    Mr. Sebala.  You know, where, when, who was there, what time,

7    you know, what was it about.

8             MS. CARPENTER-ASUI:  Okay.

9    BY MS. CARPENTER-ASUI:

10   Q    Mr. Oyadomari, did you ever have a conversation with

11   Supervisor Nunes?

12            THE COURT:  About?

13   BY MS. CARPENTER-ASUI:

14   Q    About -- did you ever ask Supervisor Nunes why he didn't

15   hire Mr. Sebala for the permanent mobile equipment servicer

16   job?

17   A    Yes.

18   Q    What did you ask him?

19   A    Why Peter wasn't hired for that position.

20   Q    And did Supervisor Nunes respond?

21   A    Yes.

22   Q    What did he say?

23   A    That he hired this other guy which was experienced in

24   tires and neva' need to be trained and he was younger.

25   Q    Who was that other guy?

1  A    And had a family.  Vargas, Chris.

2  Q    I'm sorry, I cut you off.  You said?

3  A    Vargas, Chris.

4  Q    Before that you said something about a family?

5  A    He was -- yeah, this guy was -- he hired was younger and

6  he has a family.

7        MR. BURKE:  Object, Your Honor.  Mischaracterization

8  of the testimony.

9        THE COURT:  Does seem that way.  What are we getting

10  into?

11  BY MS. CARPENTER-ASUI:

12  Q    Would you repeat what Supervisor Nunes said to you in

13  response to your question.

14  A    I asked him -- okay, that day he came up and that's when

15  he said that Mr. Sebala called him up, okay.  And he told

16  everybody in the shop that, you know, Mr. Sebala threatened

17  to -- he said that he ain't finished and he's going to file.

18        And then I asked him, I said, you know -- I told him:

19  That's not a threat.  You know, I said -- and then I asked him:

20  Why wasn't Peter hired for the position?  And then Mr. Nunes

21  said:  I hired this other guy who was qualified for the

22  position and he had all the training and everything in the

23  military.  And then I told him, I said:  Well, this guy had 27

24  years or 28 years in Oahu Sugar.  And then he said:  Well, this

25  guy younger and he has a family -- he was going get a family.

1    Going to have a family, going.

2    Q    Did anybody else hear Supervisor Nunes say those words

3    other than you?

4    A    Yes, I was told by Mr. Soares, Ace Soares --

5              MR. BURKE:  Your Honor, we will object to hearsay.

6              THE COURT:  You were told by Mr. Soares?  Objection

7    sustained.

8    BY MS. CARPENTER-ASUI:

9    Q    You said that Supervisor Nunes told you that Mr. Sebala

10   was going to file?

11   A    That's what --

12   Q    Could you --

13   A    He said he had a phone call and said that -- well, this

14   the exact words:  "You know Sebala?"

15              I go:  "Yeah.

16              "Peter Sebala?

17              "Yeah.

18              "Well, he called me and he threatened me."

19              I asked him, I said:  "What do you mean threatened?

20   What did he say?"

21              He said --

22              MR. BURKE:  Excuse me, Your Honor, I think we had this

23   narrative testimony once.  He seems to be repeating it.  Also,

24   this seems to be at a period of time after the decision-making

25   had occurred.  So we're into that post-hiring phase that is

1    employee?

2    A     21 years.

3    Q     And in 21 years, how many of these written reprimands have

4    you received?

5    A     One.

6    Q     This is the extent of your disciplinary action in 21

7    years?

8    A     Yeah, that's the one was pulled in less than a year.

9    Q     And this was issued on what date?

10   A     Gee, I don't -- I don't remember.

11   Q     What's the date at the top right?

12   A     Where?  Yes.

13   Q     Can you read it without your glasses?

14         THE COURT:  Which one are you referring to?

15         MS. CARPENTER-ASUI:  The written reprimand, Your

16   Honor.

17         THE WITNESS:  The reprimand.

18         MS. CARPENTER-ASUI:  I'll represent that it's stamped

19   April 16th --

20         THE WITNESS:  16, 2000 --

21         THE COURT:  It's not in evidence.

22         MS. CARPENTER-ASUI:  Yes, Your Honor.  I just want to

23   know about the timing of this.

24         THE WITNESS:  10 -- 4/01 --

25         THE COURT:  Let's not get too much testimony about it.

1    All you're asking is what the date was.

2              MS. CARPENTER-ASUI:  Right.

3    BY MS. CARPENTER-ASUI:

4    Q    So this was five years ago, correct?

5    A    Yes, I guess.

6    Q    Okay.  And today are you upset about this piece of paper

7    you received five years ago?

8    A    No.

9    Q    Are you so upset about this piece of paper that you would

10   come to court and commit perjury and risk going to jail?

11   A    No.

12   Q    Are you so upset that you would make false statements

13   about what Supervisor Nunes said to you in the workplace?

14   A    No, I'm not upset.  No, because my reprimand was pulled

15   less than a year.  It didn't go the whole two years.  I'm not

16   upset.

17   Q    Okay.  So it's not even in your record anymore?

18   A    No, it ain't.  It's not even in personnel.

19   Q    It shouldn't even be part of this case, should it?

20   A    Right.

21             MR. BURKE:  Excuse me, Your Honor.

22             THE COURT:  You know, you can make your speech later.

23             MS. CARPENTER-ASUI:  Yes, Your Honor.  Nothing

24   further, Your Honor.

25             THE COURT:  Anything further of Mr. Oyadomari?

1          (A recess was taken from 3:35 p.m. to 3:45 p.m.)

2                          DIRECT EXAMINATION

3     BY MS. CARPENTER-ASUI:

4     Q    Mr. Sebala, what is your birth date?

5     A    August 27, 1949.

6     Q    How old are you today?

7     A    56.

8     Q    What was your first job after high school?

9     A    I worked at Oahu Sugar during school.

10    Q    So before you graduated from high school you worked there?

11    A    Yes, as a part-time --

12         MAJOR WIRTANEN:  Objection, Your Honor.  Information

13    that Mr. Sebala -- of his entire work history is not relevant.

14    What is relevant is what Mr. Nunes knew of Mr. Sebala's history

15    when making the selection decision.

16         THE COURT:  Well, this is just preliminary.  It goes

17    to credibility, all this stuff.  Just don't spend too much

18    time.

19         MS. CARPENTER-ASUI:  Yes, Your Honor.

20    BY MS. CARPENTER-ASUI:

21    Q    How many years did you work at Oahu Sugar Company?

22    A    Roughly about 26, 27 years.

23    Q    And what years did you work at Oahu Sugar Company?

24    A    From 1967 to around 1995.

25    Q    Why did you leave your job at Oahu Sugar Company?

1   A    They closed the plantation.

2         THE COURT:  He didn't leave his job at the sugar

3   plantation, the sugar plantation left him.

4         Is that right?

5         THE WITNESS:  That's right.

6   BY MS. CARPENTER-ASUI:

7   Q    What jobs did you perform while you worked at Oahu Sugar

8   Company?

9   A    My job was to repair, dismount, mount the flats, working

10  with the heavy equipment.  I did troubleshooting, I worked on

11  graders, crawlers, a tractor with rubber tires.  Part of my

12  responsibility was to train new employees on safety, operating

13  jacks, electrical tools, plows, earth movers.  That was my job

14  to repair and fix flats, recapping program.  That's about it.

15  Q    How long were you in the tire shop/preventive maintenance

16  job?

17        THE COURT:  Where?

18        MS. CARPENTER-ASUI:  The tire shop/preventive

19  maintenance job.

20        THE WITNESS:  26 years.

21        THE COURT:  At Oahu Sugar?

22        MS. CARPENTER-ASUI:  I'm sorry, what did you say?

23        THE COURT:  You talking about Oahu Sugar?

24        MS. CARPENTER-ASUI:  Yes, Your Honor.

25        THE COURT:  I thought we graduated from there.  Okay.

1    Go ahead.

2    BY MS. CARPENTER-ASUI:

3    Q    26 years there in the --

4    A    Yes.

5    Q    And what, if any, leadership jobs did you hold?

6    A    I was the shop leader.  My job was for training of the new

7    guys, teaching them about safety, records, keeping records,

8    stocking, and teaching them about all the tires and safety

9    parts and repairing and showing them how to do it.

10    Q    How long were you the tire shop leader?

11    A    Excuse me?

12    Q    How long were you the tire shop leader?

13    A    Roughly about 20 years.

14    Q    What duties did you have working in the tire shop?

15         THE COURT:  Are we going to spend all this time at

16    Oahu Sugar?

17         MS. CARPENTER-ASUI:  Okay, Your Honor, I'll move

18    forward.

19         THE COURT:  Yeah, why don't we move along.

20    BY MS. CARPENTER-ASUI:

21    Q    What, if any, military service do you have?

22    A    I was in the Army.  I served in Vietnam from '70 to '71.

23    Q    When you left military service, what type of discharge did

24    you receive?

25    A    Honorable discharge.

```
 1   things are listed on Mr. Sebala's resume that was submitted for
 2   the position.
 3           MS. CARPENTER-ASUI:  They are on his SF50, which is
 4   part of his military record, which Mr. -- Supervisor Nunes
 5   would have access to.
 6           THE COURT:  I'll take your word for it.
 7           MS. CARPENTER-ASUI:  We'll move on, Your Honor.
 8   BY MS. CARPENTER-ASUI:
 9   Q   Where did you work after you worked at Oahu Sugar Company?
10   A   I was employed at Hauoli Fumigation.
11   Q   How many years did you work there?
12   A   I spent five years there.
13   Q   What years were those?
14   A   Excuse me?
15   Q   What years did you work there?
16   A   From '97, 1997 to 2002.
17           THE COURT:  '97?
18           THE WITNESS:  '97.
19   BY MS. CARPENTER-ASUI:
20   Q   And why did you leave your job at Hauoli Fumigation?
21   A   I was a chemical applicator.  I installed --
22   Q   No, why did you leave your job at Hauoli Fumigation?
23   A   Oh, I had a chance to work at the -- I had an opportunity
24   to work at a tire shop at Hickam Air Force Base.
25   Q   And how did you find out about the job at Hickam Air Force
```

1    Base?

2    A    Word of mouth.

3    Q    What position did you apply for at Hickam Air Force Base?

4    A    It was mobile equipment servicer.

5    Q    And was that a temporary or permanent job?

6    A    It was a temporary one-year appointment job.

7    Q    What dates did you work in that temporary appointment job?

8    A    What year?

9    Q    What dates?

10   A    January 28, 2002, to January 28, 2003.

11   Q    And what were your duties as a temporary one-year mobile

12   equipment servicer at Hickam?

13   A    My duties were to repair or install flat tires, mount and

14   dismount, get into a recapping program, stocking, safety

15   equipments.  I did -- I worked on buses and tractors and rubber

16   tire tractors such as forklifts, duce-and-a-half, three-quarter

17   tons, loading, loading equipments, graders, Peterbilts,

18   anything that was rubber made.

19   Q    What were you given that told you what your job duties

20   were at Hickam, if anything?

21   A    What was that again, excuse?

22   Q    Did you ever receive a job description for your duties as

23   a mobile equipment servicer?

24   A    Oh, yes, I did.

25   Q    Would you turn to Exhibit 12, please?  12.

1        (Plaintiff's Exhibits 12, 12A, 12B, 12C and 12D

2              were received in evidence.)

3   BY MS. CARPENTER-ASUI:

4   Q    What, if any, of your duties as a temporary one-year

5   appointee mobile equipment servicer did you perform at any of

6   your previous jobs?

7   A    Basically Oahu Sugar and Hickam had the same, everything

8   was just about the same.

9   Q    When you worked as a temporary one-year appointee mobile

10  equipment servicer, from January '02 to January '03, did anyone

11  train you to do your job?

12  A    Just on the tire machine, the hydraulic mounter and

13  dismounter.  I was familiar with everything else.  The machine

14  that they had there, they just had bought.  It was a new type

15  of machine.  I kind of was familiar with those machines, but we

16  had hydraulic arms on them instead of little toggle switches,

17  we had electrical switches now that run just --

18  Q    Who trained you to use the new machine at Hickam?

19  A    Well, Mike Oyadomari.  He -- he showed me how to operate

20  the switches.

21  Q    How long did it take you to learn to use that machine?

22  A    About a week maybe.  Maybe two.  Less.

23  Q    Was it similar to the tire machine used at Oahu Sugar?

24  A    Yes, it was.

25  Q    What was the difference?

1  A    They had electrical switches instead of hydraulic arms.

2  Q    When you worked as a temporary one-year appointed mobile

3  equipment servicer, did you ever ask anyone at work, co-workers

4  or supervisors, how to do your job?

5  A    No, never.

6  Q    Did you ever ask them -- strike that.

7        What types of vehicles did you work on as a temporary

8  one-year appointee from January '02 to January '03 at Hickam?

9        MAJOR WIRTANEN:  Objection, relevance.

10        THE COURT:  Are we going to go through all the

11  equipment?

12        MS. CARPENTER-ASUI:  Okay, Your Honor, we'll skip

13  that.

14        THE COURT:  I understood he worked on everything.

15        MS. CARPENTER-ASUI:  Yes, Your Honor.

16  BY MS. CARPENTER-ASUI:

17  Q    Who was your immediate supervisor at Hickam when you

18  worked there as a temporary mobile equipment servicer?

19  A    Supervisor Randall Nunes.

20  Q    What, if any, complaints or criticisms did Supervisor

21  Nunes tell you he had about your work from January '03 to --

22  '02 to January '03?

23  A    I had no complaints from him.  He gave me a rating, and he

24  said good work, good job.  If he had any complaints, I never

25  was confronted with anything.

1    Q    Who was Supervisor Nunes' boss when you worked at Hickam

2    as a mobile equipment servicer?

3    A    Superintendent Tim Peris.

4    Q    What, if any, complaints or criticisms did Supervisor

5    Peris have about your work performance from '02 to '03?

6    A    Nothing.

7    Q    Who, if anyone, informed you that there was any deficiency

8    or problem with your work or work performance or your attitude

9    during your one-year temporary employment as a mobile equipment

10   servicer?

11   A    I never had -- never was approached by none of the

12   supervisors saying that my job wasn't sufficient.  My -- that

13   rating sheet shows the story that I had done my job.

14   Q    How about your attitude; did anyone, Supervisor Nunes or

15   acting supervisor Soares, ever speak to you about your attitude

16   at work?

17   A    Never.  Never.

18   Q    How many times did you call in sick when you worked at

19   Hickam as a one-year temporary mobile equipment servicer?

20   A    One time.

21            MAJOR WIRTANEN:  Your Honor --

22            THE COURT:  Wait just a minute.

23            MAJOR WIRTANEN:  -- objection.  The plaintiff has been

24   really leading this witness, and this is the plaintiff.  So we

25   would recommend or suggest that there's no more leading

1    BY MS. CARPENTER-ASUI:

2    Q    Do you know of Supervisor Nunes giving anybody else job

3    orders while they were using the toilet?

4    A    I only seen it done to me.

5    Q    Otherwise, he puts it in the cubbyhole?

6    A    Yes.

7    Q    And before your temporary one-year term as a mobile

8    equipment servicer ended, did you ever tell Supervisor Nunes

9    that you were interested in the job if it went permanent?

10   A    I heard from the guys that they was going to make that --

11   that it's going to be a permanent position, but when, I don't

12   know when.

13   Q    But did you ever say anything to Supervisor Nunes about

14   the job going permanent?

15   A    If the job was going permanent?

16   Q    Did you ever tell Supervisor Nunes that you were

17   interested in getting the permanent job?

18   A    Oh, yes, yes.

19   Q    What did you say?

20   A    I said:  "Oh, if the thing -- if the permanent job come

21   up, I can apply for 'em?"  And he said:  "Yeah, you can."  You

22   know, but by the time the -- the job had come up for permanent

23   position, I already was out of Hickam.  And then I called the

24   shop, check on the guys, you know, how's it to everybody, and

25   they told me:  "'Eh, the permanent position came up, so go

```
 1   apply."

 2          So my son and I went online and he helped me get

 3   online, and I sent my resume in.

 4   Q    Who did you talk to when you called the shop?

 5   A    I talked to Terry Shinjo, I talked to Mike, I talked to

 6   Darrell, I talked to Ace -- I talked to -- who else?  Robin

 7   just for say how's it to everybody.

 8   Q    Was that one phone call or more than one phone call?

 9   A    That was one phone call.

10          THE COURT:  But you got your application in?  You got

11   your application in?

12          THE WITNESS:  Yes, online.

13          THE COURT:  And your son applied, also?

14          THE WITNESS:  I what?

15          THE COURT:  Your son applied, also?

16          THE WITNESS:  No, no, no, he helped me apply.  He help

17   me make up my -- put in my resume.

18          THE COURT:  When I use the computer, I use my

19   grandchildren.

20          THE WITNESS:  Oh, mine, too.

21   BY MS. CARPENTER-ASUI:

22   Q    And approximately when was this when you called to say

23   "how's it" to the shop?

24   A    Roughly about the early part of 2003, the early part.

25   Q    Well, before the deadline to apply for the permanent job?
```

1   A    Not exactly sure when the deadline was.

2        THE COURT:   It doesn't say on the online thing?

3        THE WITNESS:   I no can recall the date.

4   BY MS. CARPENTER-ASUI:

5   Q    And when you called the guys at the shop, did you also

6   learn that Chris was working there at the shop, that his

7   one-year term had been extended?

8   A    Oh, I neva' know his term was extended, but I talked to

9   couple of the guys, and Terry told me that:  "Oh, Chris already

10  working there."  And I said:  "What?  I neva' got the -- the

11  paper of" -- what you call --

12       THE COURT:   The notice?

13       THE WITNESS:   -- "the notice of -- that I wasn't

14  picked for the job yet."  And he said he already working there.

15  So I said:  "Oh, wow."  You know, I said:  "Well, you know what

16  I going do, I just going wait for that paper come in, and then

17  I going make one complaint, you know."

18  BY MS. CARPENTER-ASUI:

19  Q    And did a notice ever come in to you?

20  A    Yes, it did.   Notice came in.

21  Q    And who wrote you that notice?

22  A    Supervisor Randy Nunes.

23  Q    And when you received the notice, did you do anything

24  after that?

25  A    Yes, I called personnel department and I --

1          MAJOR WIRTANEN:  Objection.  Relevance.

2          THE COURT:  No, I'll -- I'll let him answer that.

3     Overruled.

4          You called the personnel department?

5          THE WITNESS:  Yes, I called the personnel department

6     and, you know, I wouldn't have said anything.  I knew who had

7     the job already, so I just waiting for the paper to come for

8     make it legal like.

9          So I called personnel department and I said:  "How

10    come I neva' get the job?"  And they said three applicants was

11    chosen from the personnel department, and I was one of them and

12    they sent it to the hiring body.  And the hiring body was

13    Supervisor Randall Nunes.  And it was up to him to make the

14    choice of who he would pick.  And I told 'em:  "So how can I

15    fight this?"  I said:  "You know, that's wrong.  I get more

16    experience than Chris.  I been work longer than he's been

17    alive."  And he said:  "Well, go talk to the hiring body."

18         So I called Randy.  Randy Nunes.  And Randy Nunes, he

19    answered, I told him:  "'Eh, how come you wen' pick Chris over

20    me?  I get more experience."  He said:  "Oh, he got his

21    experience in the service."  And I said:  "Oh, how many years

22    he have in the service, what, three years?  I get 27 years of

23    tire experience.  And he gained three years of experience in

24    the service?"

25         And he said:  "Well, I picked the best qualified

1    person."  And -- and I told him:  "Well, I going fight this."

2    And he said:  "Go," and then he wen' hang up on me.

3    BY MS. CARPENTER-ASUI:

4    Q    Would you turn to Exhibit 59A.

5    A    Okay.

6    Q    Is this something you've seen before?

7              THE COURT:  What are we looking at?

8              MS. CARPENTER-ASUI:  Exhibit 59A.

9              THE COURT:  59.

10             MS. CARPENTER-ASUI:  Is the letter informing him of

11   the non selection.

12             THE WITNESS:  I never -- I never saw this letter, was

13   just by mouth.

14   BY MS. CARPENTER-ASUI:

15   Q    You did not receive this letter?

16   A    Not -- not this.

17   Q    Are you looking at 59A?

18   A    Oh.  Excuse.  Sorry.  Oh, I got it now.

19             THE CLERK:  You got it?

20             THE WITNESS:  Yeah, I was on that page.  Oh.

21             Yeah, this was from Randall Nunes.

22   BY MS. CARPENTER-ASUI:

23   Q    And how did you -- did you ever receive this letter in the

24   mail?

25   A    Yes, I received this letter.

1      THE WITNESS:  No, I told him why did he choose Chris

2  over me.

3      THE COURT:  Yeah.  And you told him you -- that it was

4  discrimination and you -- hmm?

5      THE WITNESS:  I didn't know what to -- to file.  I was

6  all confused.  I was hurt.  I neva' know whether to file job

7  discrimination, age discrimination or race, or what.  I neva'

8  know what for file.  I was all confused.  Nobody told me that I

9  could file at the EEO office a complaint.  I -- several

10  times --

11      MAJOR WIRTANEN:  Objection.  Objection.  Beyond the

12  scope of the judge's question.

13      THE COURT:  Yeah, wait for a question.

14  BY MS. CARPENTER-ASUI:

15  Q    Mr. --

16      MS. CARPENTER-ASUI:  Your Honor, plaintiff moves to

17  introduce 59 and 59A.

18      THE COURT:  Any objection?

19      MAJOR WIRTANEN:  No, Your Honor.

20      THE COURT:  Exhibit 59 is in evidence.

21      (Plaintiff's Exhibit 59 was received in evidence.)

22      THE CLERK:  And 59A, Your Honor?

23      THE COURT:  59A?

24      THE CLERK:  59A.

25      THE COURT:  There's another page?

1          THE CLERK:  She had asked for both.

2          THE COURT:  Any objection to 59A?

3          MAJOR WIRTANEN:  No, Your Honor.

4          THE COURT:  All right.  It's in evidence.

5      (Plaintiff's Exhibit 59A was received in evidence.)

6          THE CLERK:  Thank you, Your Honor.

7  BY MS. CARPENTER-ASUI:

8  Q    So, Mr. Sebala, after you found out that you were not

9  going to get the job and you spoke to Supervisor Nunes and he

10 said he selected someone else, did you do anything about it?

11 A    Yes, I -- I called back the personnel and told them if

12 they could do something about it, and they said:  "Oh, it's all

13 left up to the hiring body."  And that was Randall Nunes.

14          So I told them that I was going to fight it, but I

15 neva' know where to go.  I kept calling --

16          MAJOR WIRTANEN:  Objection.  Beyond the scope of the

17 question.

18 BY MS. CARPENTER-ASUI:

19 Q    Okay.  After you called the personnel office and told them

20 you were going to fight it, did you call anyone else?

21 A    Yes, I -- I talked to WorkLink, I went to the job labor

22 union officer, I called them --

23          MAJOR WIRTANEN:  Objection.  Relevance.

24          THE COURT:  I'll overrule that objection.

25 BY MS. CARPENTER-ASUI:

```
 1    Q    I'm sorry, you went to WorkLink and job labor union
 2    office?
 3    A    Job labor union office.  I went to the vet center.  I went
 4    to so many people.  I -- I kind of gave up already, you know.
 5    And --
 6    Q    Did you --
 7              THE COURT:  What did you tell them was the reason that
 8    you were complaining?
 9              THE WITNESS:  That I was unfairly treated in some way.
10              THE COURT:  That you were the better man?
11              THE WITNESS:  Did I what?
12              THE COURT:  Why -- why did you complain, because you
13    were the better man, you thought?
14              THE WITNESS:  Yes.  I am the better man.  I am.
15              THE COURT:  That was your basis?
16              THE WITNESS:  Yeah.  Qualified for the job.
17    BY MS. CARPENTER-ASUI:
18    Q    And did you --
19              THE COURT:  You thought the other fellow was not
20    qualified?
21              THE WITNESS:  I worked with him for a year, and he
22    would ask me time and again:  "Oh, you know, and I -- I see you
23    work like that.  I wish I could do those kind of stuffs."  He
24    asked me about how can you do this, or what can I do, you know,
25    he asked me questions like that.  And you know, 'cause his shop
```

1   was right next to mine, too, you know, and he would ask me

2   about tires and stuff.  I worked with that person for a year,

3   so I know he don't have the experience.

4   BY MS. CARPENTER-ASUI:

5   Q    Was that Chris Vargas that asked you the questions?

6   A    Chris Vargas, yes.  Yes, ma'am.

7   Q    Did you write any letters to anyone?

8   A    I wrote letters to the senator, to Congress, Akaka,

9   Abercrombie, Case.

10              THE COURT:  Inouye?

11              THE WITNESS:  I done all that.

12              THE COURT:  Did you write to Senator Inouye?

13              THE WITNESS:  Yes, I did.

14              THE COURT:  Oh.

15              THE WITNESS:  Abercrombie.  And they had written to

16   the base commander, the base commander wrote me a letter and

17   said if I have a formal complaint, that I should see his EEO

18   officer.  And that's the only time I knew about that I could

19   make a complaint at the EE office -- EEO office.

20              THE COURT:  And did you?

21              THE WITNESS:  Yeah, I made a complaint.  As soon as I

22   got the letter from the base commander, immediately I made an

23   appointment and we made a complaint.

24   BY MS. CARPENTER-ASUI:

25   Q    Did you receive responses from Senators Akaka, Inouye --

```
 1              THE COURT:  Well, you don't need all those letters.
 2              MS. CARPENTER-ASUI:  Okay.
 3  BY MS. CARPENTER-ASUI:
 4  Q    But did you receive responses?
 5  A    Yes, I did.
 6  Q    And you also received a copy of the base commander's
 7  letter --
 8              THE COURT:  Doesn't matter.
 9              THE WITNESS:  Yes, I did.
10  BY MS. CARPENTER-ASUI:
11  Q    -- to them?
12  A    Yes.
13              MS. CARPENTER-ASUI:  Okay, we won't move all of those
14  documents into evidence then.
15  BY MS. CARPENTER-ASUI:
16  Q    Okay.  So when you read the base commander's letter, is
17  that -- did you see anything important in there?
18  A    Yes.  He told me if I had a formal complaint, that I could
19  go to his EEO officer, and that's the only time I knew that --
20  where to go to make a complaint like that, 'cause I had called
21  everybody else and nobody told me that I could make a
22  complaint.  I was at the labor -- I mean the personnel
23  department, I was -- I talked to the supervisors about 'em, and
24  this and that.
25              MAJOR WIRTANEN:  Objection, Your Honor --
```